Mrs. James Pittman

*v.*

City Stores, Inc., D/B/A B. Lowensteins Bros., and
New Amsterdam Casualty Co.

(*Nashville,* December Term, 1958.)

Opinion filed March 12, 1959.
Rehearing denied May 1 1959.

William A. McTighe, Memphis, for petitioner-appellant.

McDonald, Kuhn, McDonald & Crenshaw, Memphis, for respondents-appellees.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This is a workmen's compensation case, and the only question at issue is whether or not the petitioner's suit is barred by the statute of limitations of one year as provided by our Workmen's Compensation Act, T.C.A. secs. 50-1003, 50-1017. The Chancellor sustained a special plea of this statute, resulting in this appeal.

The facts and circumstances which gave rise to the cause of action are not in dispute. It is therefore important that we state the material evidence and also the nature of the injury sustained by the petitioner.

The accident occurred on December 18, 1954, while the petitioner, Mrs. Pittman, was at work as a saleslady for the defendant. The defendant's store is known as Lowensteins, although it is incorporated under the name of "City Stores, Inc." Mrs. Pittman was employed to work during the Christmas Holidays in 1954, at which time she was 18 years of age and was married. No one can doubt the truthfulness of her testimony. But the reason for her failure to sue for her injury under the Workmen's Compensation Act until July 11, 1958, 3½ years after the accident, is open to serious dispute. It conclusively appears that the petitioner saw a doctor

the day following the accident. She says she saw him "the very next day". She described the accident and the effect of it, as follows:

"A. Yes, sir; well, I was waiting on a customer and I was working in the stationery department and I struck my head on the counter that was up above, and I went in to get a card table cover and when I came to, I was down in the restroom.

"Q. Now, you say it knocked you unconscious? A. Yes, sir; for a few minutes.

"Q. When you came to you were in the restroom, was that on a separate floor in the building? A. Yes, sir.

"Q. It was downstairs? A. Yes, sir.

"Q. You came to downstairs, and what happened there? A. They called a day nurse, I guess, or a nurse that works in the store and they had called my husband, they informed me when I came to. When he got there they rolled me to the truck in a wheelchair because I was unable to walk."

She testified that she saw Dr. Goldberg a number of times during 1954 and 1956, "but not for my head". Continuing she says:

"* * * It was in 1956 when I went back; my neck and head had been giving me trouble but I didn't think it was anything serious until I started having a paralyzing feeling and twitching in my eye; so I went to Dr. Goldberg and he x-rayed and examined me.

*    *    *    *    *    *

"Q. Your neck hurt and you would get dizzy? A. Yes, sir.

"Q. Now, during that period of time after you went there and before you went back in 1956, did you continue to or did you not, have any symptoms or feeling in your head that were not usual? A. Well, you mean from 1954 to 1956?

"Q. Yes, just tell the Court, if anything, what you had. A. Well, I had headaches, my neck would hurt but I thought it was just one of those things, a crick in the neck or a headache and I didn't think too much about it until I started having paralyzing feelings and I had the baby at this time.

"Q. In this period of time; how, were you doing your housework, and able to work in those days before 1956 when you went back to the doctor? A. Yes, sir."

We reach the definite conclusion from Mrs. Pittman's testimony that her condition grew progressively worse from the day of the accident until this suit was instituted 3½ years thereafter, although there were intervals when she may have been more or less free from pain.

Her sole reason for not instituting a suit against the defendant sooner appears in the following questions and answers:

"Q. Now, in 1957 when you went into the hospital and were in head traction at that time, did the doctor advise you, was he able or did he advise you that your troubles were definitely attributable to this accident in 1954? A. No, he wouldn't say definitely; he wasn't sure.

"Q. He wouldn't definitely say that they were attributable to the accident in 1954? A. No, sir.

"Q. I believe at that time you had an attorney, Mr. Richard Busby representing you? A. Yes, sir.

"Q. And due to the fact that the doctor was not definite in his diagnosis, I suppose you took no action at that time? A. Yes, sir."

By consent of counsel a statement by Dr. Goldberg was read into the record. We quote it in full, as follows:

"In December of 1954, Mrs. James Pittman, Jr., was examined in this office because of a head injury, which occurred on December 18, 1954. At that time the patient stated that she struck her head on a desk while at Lowenstein's and, as a result of the injury, she developed a neck ache and some dizziness. The physical examination in 1954, was essentially negative, except for spasm of the post cervical muscles and difficulty in turning the head. The remaining neurological examination was normal. No x-rays were made.

"On November 13, 1956, Mrs. Pittman was re-examined by me, at which time she stated that she had had headaches over the vertex of the skull and temple areas since the injury at Lowenstein's two years previously. She also complained at this time of a feeling of tightness of her skin over the face, her eyes would twitch and the back of her neck was causing her to have considerable pain. These latter symptoms had been present about three months. My physical examination at this time revealed limitation of motion of the head and tenderness in the deep muscles of the neck. X-

rays were made of the cervical spine in November and these revealed abnormal straightening of the cervical spine. Mrs. Pittman was seen on numerous occasions through December and, at each time, she complained of increasing pain in the posterior neck and her face continued to feel numb. Again cervical spine x-rays revealed abnormal straightening.

"Because of the persistence of severe neck pain, the patient was fitted with a Thomas collar, and, during the next few weeks, there was some improvement.

"In March of 1957, neck pains again became severe and she entered Baptist Memorial Hospital for further studies and was placed in head traction. It is my opinion that Mrs. Pittman has developed an abnormal condition of the cervical spine, which is in many respects similar to a cervical disc. The entire series of x-rays, including one as recent as 7/1/58, show a progression of the abnormalities of the cervical spine, and she has developed a reversal of the cervical curve.

"While it is hard to realize that symptoms would develop two years after the accident, it is entirely possible that such may be the case and that the original injury, if severe enough, may be responsible for this entire chain of events.

"After a number of months of relative freedom from pain, Mrs. Pittman again is having trouble with her neck and her arms. In spite of the fact that during three months she was able to remain fairly comfortable with the use of a Thomas collar, this episode is so painful that the Thomas collar affords her no relief, and hospitalization with myelographic studies is anticipated."

The testimony of Mrs. Pittman and the foregoing statement by Dr. Goldberg was all the evidence in the case. There was no evidence of any injury prior or subsequent to the accident complained of.

The Chancellor sustained the defendant's plea in abatement, and we now have the case under the following assignments of error:

"[1] There is no evidence to support the findings and decree of the lower Court.

"[2] The Court erred as a matter of law in holding that Petitioner's action was barred by the Statute of limitations and in sustaining defendant's plea on this ground."

The cases relied on by counsel for Mrs. Pittman are *Ogle v. Tennessee Eastman Corp.*, 185 Tenn. 527, 206 S.W.2d 909; and *Griffitts v. Humphrey*, 199 Tenn. 528, 288 S.W.2d 1.

The sole question involved on this appeal is the time when the statute of limitations is tolled. Is it tolled one year from the date of the accident, which was December 18, 1954, or one year from the date of the injury, which, according to the appellant's insistence, was much more than one year after the accident, viz three or three and one half years thereafter?

■ The statute of limitations which applies to the case at bar is quoted and construed by us in *Ogle v. Tennessee Eastman Corp.*, and *Griffitts v. Humphrey, supra,* and need not be repeated in this opinion. Both cases were correctly decided on the facts. The words "accident" and "injury" are not synonymous. In numerous cases, which require no special reference, an ac-

cident may appear to be trivial when it occurs, in that the employee apparently experiences no injury whatever, or nothing to indicate at the time that a partial or permanent injury had resulted from the accident. This was substantially true in the Ogle case. His eyes were irritated and inflamed by the explosion of poison gases. The company doctor treated him until "he was apparently fully recovered." But an eye specialist discovered more than a year after the accident and injury, that he had lost the sight of his eye. The plea of the statute of limitations was overruled on the ground that it was tolled as of the time when the specialist discovered that Ogle had lost his eye.

In the Griffitts case Mr. Justice Burnett reviews a number of decisions by this Court relating to the tolling of the statute in compensation cases. He makes special reference to *McBrayer v. Dixie Mercerizing Co.*, 176 Tenn. 560, 144 S.W.2d 764; and *Burcham v. Carbide & Carbon Chemicals Corp.*, 188 Tenn. 592, 221 S.W.2d 888. The principle is reaffirmed that the statute is tolled as of the date of the known disability and that it results from the accident.

The case now before us differs somewhat from the facts reviewed by Mr. Justice Burnett in the Griffitts case. We think the opinion of the Court in *Bradford v. Dixie Mercerizing Co.*, 199 Tenn. 170, 285 S.W.2d 136, is applicable here. Another case more nearly in point is *Netherland v. Mead Corp.*, 170 Tenn. 520, 98 S.W.2d 76, although in this case the company doctor had advised the employee that his injury was more or less trivial. Contention was made that the doctor's advise misled the petitioner and for this reason the tolling of the statute

was postponed beyond the statutory period of one year. The ruling of the Chancellor denying compensation was sustained.

■ Considering the entire testimony in this case, and accrediting it in the light most favorable to the employee, we think it would be both unwise and illogical and far beyond the purview of the statute for us to hold that the tolling of the statute of limitations is suspended pending an examination and final report by medical experts as to the percentage of the injured employee's disability.

The assignment of error is overruled, and the judgment of the Chancellor is affirmed.